OPINION
{¶ 1} Defendant-appellant, Clive N. Melhado, was indicted on two counts of aggravated murder, with specification, in violation of R.C.2903.01 and one count of aggravated robbery in violation of R.C. 2911.01. Each count included a firearm specification. At the conclusion of the guilt phase of appellant's trial, held in the Franklin County Court of Common Pleas, the jury found him guilty on count one of the lesser included offense of murder in violation of R.C. 2903.02; on count two of aggravated murder, with specification, in violation of R.C. 2903.01; and on count three of aggravated robbery in violation of R.C. 2911.01. Appellant was additionally found guilty on each firearm specification.
 {¶ 2} Upon the conclusion of the subsequent penalty phase of the trial, the jury recommended that appellant be sentenced to life imprisonment without possibility of parole. At sentencing, after determining that count one merged with count two, the trial court, in accordance with the jury's recommendation, sentenced appellant to a term of life imprisonment without possibility of parole on count two, plus three consecutive years of actual incarceration for the firearm specification. The court further sentenced appellant to eight years of imprisonment on count three, plus three consecutive years of actual incarceration for the firearm specification. The court specified that the sentences on counts two and three would be served concurrently. It is from the court's March 28, 2002 judgment entry of conviction and sentence that appellant now appeals.
 {¶ 3} The facts pertinent to this appeal are as follows. Appellant was charged with the June 11, 2001 murder of Jerome Cunningham. Early on that day, Cunningham hosted an "after-hours" dice game in his apartment at 1943½ Cleveland Avenue. Alcohol was being served at the game. According to witness Wendall Brown, appellant lost quite a bit of money during the dice game, and was inebriated by the game's conclusion. After the game broke up, appellant entered the kitchen of the apartment, along with Cunningham, Wendall Brown, and Mr. Brown's brother, Roderick Brown. According to Wendall Brown, when the foursome arrived in the kitchen, appellant left the premises for no more than 20 seconds, returned to the kitchen and asked Cunningham for a loan. Mr. Brown testified that, without allowing Cunningham time in which to respond, appellant shot Cunningham at a range of three to four feet. Cunningham's resulting injuries proved fatal.
 {¶ 4} Wendall Brown did not actually see the murder weapon, but he heard the shot and saw Cunningham fall. He testified he is certain that appellant shot Cunningham. Upon seeing Cunningham fall to the floor, Wendall Brown ran out the door and into an alley. Within a few minutes he was apprehended and handcuffed by police. Wendall Brown told police he was not the shooter, but that the shooter was wearing an orange t-shirt. He further stated that the shooter, "shot my friend. And my brother is up in there." Later, after appellant was apprehended, Wendall Brown identified him as Cunningham's shooter.
 {¶ 5} Roderick Brown testified that he, his brother and Cunningham went into the kitchen area of Cunningham's apartment after the dice game broke up, and appellant went out onto the back porch. Roderick Brown saw appellant "shuffling" with his shirt while on the porch. Roderick Brown then saw appellant reenter the apartment, walk up to Cunningham and ask him for a loan. Before Cunningham could respond, according to Roderick Brown, appellant shot Cunningham from a distance of about four feet.
 {¶ 6} Like his brother, Roderick Brown did not actually see the gun, but he did see something shiny in appellant's hand. He testified it must have been a gun because Cunningham was shot. Roderick Brown fled out the bathroom window and onto the roof, and then jumped onto a nearby building. He returned to Cunningham's apartment a short while later, through the same window, after making sure appellant had not pursued him. Upon his reentry to the apartment, Roderick Brown found Faith Brown — Cunningham's girlfriend — crying over Cunningham. Roderick Brown identified appellant as the shooter within 30 minutes of appellant's capture, and testified at trial that he is "100 percent sure" that appellant shot Cunningham.
 {¶ 7} Faith Brown testified that she was in Cunningham's apartment when the dice game broke up. She remained in the gambling room, but could see Cunningham standing in the kitchen from her vantage point. She saw Cunningham when he was shot, but did not see the shooter. After running through the kitchen to the living room to look for a telephone, and then returning to the kitchen when she could not locate a phone, Faith Brown saw appellant leaning over Cunningham with his hand in Cunningham's pocket. According to Faith Brown, appellant pointed his gun at her and twice told her to get back. She testified that the gun was long and silver. She identified the gun at trial. Faith saw Roderick Brown reenter the apartment through the bathroom window. When the police arrived, she identified appellant as wearing an orange t-shirt and blue jogging pants. She later identified appellant in a photo array as the man who waved the gun at her.
 {¶ 8} Columbus Police Detective Rob Warnick testified that, while on patrol in the early morning hours of June 11, 2001, he heard a gunshot while he was sitting in his cruiser. He proceeded to a nearby alley, wherein he nearly sideswiped a man who had to jump out of the way to avoid being hit by the cruiser. Detective Warnick then came upon and apprehended Wendall Brown. Brown told him that he was not the shooter and that the shooter was wearing blue and orange. Warnick broadcast the description and noted that the man he had almost hit with his car fit the description given by Wendall Brown. As Warnick proceeded up the alley with Wendall Brown, he came upon Officer David Myers, who was pursuing appellant. Appellant was wearing powder blue and bright orange clothing.
 {¶ 9} Warnick and Myers succeeded in apprehending and handcuffing appellant. When they rolled him over, appellant's pocket fell open and a wallet and loose cash were inside. According to police, it appeared as though the cash had been shoved into the pocket. It was later confirmed that the wallet contained Cunningham's identification. Officer Jason Arnold, who had responded to the shooting and who assisted in taking custody of appellant, testified that he found a large amount of cash and a wallet in appellant's pants pocket, and that the wallet contained Cunningham's identification. He further testified that, at the time he was apprehended, appellant was wearing blue and orange and was missing a shoe.
 {¶ 10} Officer Myers testified that he first saw appellant while handcuffing two males who had been stopped after police responded to Warnick's broadcast. Officer Myers saw appellant walking away from the area; when the officer tried to gain appellant's attention, he quickened his pace. Officer Myers chased appellant, who began running. Officer Myers yelled at appellant to stop, but appellant did not stop until Myers overtook him. Officer Myers testified that appellant's clothing matched Warnick's earlier description, and appellant was missing a shoe. Officer Myers' testimony corroborated that of the other officers with respect to the cash and wallet found in appellant's pocket.
 {¶ 11} Columbus Police Officer Mark Fester testified that, upon responding to Detective Warnick's broadcast, he and his partner noticed a single shoe at the bottom of a stairway leading to Cunningham's apartment building. The stairs led them to an open door to the upper apartment. Inside they found Cunningham's body lying on the kitchen floor. Officer Fester's search for the murder weapon ultimately led him to a .45 caliber weapon on the roof of the building immediately to the South of Cunningham's apartment. This weapon was identified as State's Exhibit B-2a, the same weapon identified by Faith Brown. Fester also identified State's Exhibit B-4 as the shoe found at the bottom of the stairs.
 {¶ 12} Officer Fester's partner, Scott Leroy, testified about finding the single shoe and finding Cunningham. Officer Leroy later transported Roderick Brown to a nearby McDonald's restaurant, where Mr. Brown identified appellant as the shooter.
 {¶ 13} Crime Scene Detective Kevin Jackson testified that he confiscated various items of evidence from Cunningham's apartment, including the gun and Cunningham's wallet and identification.
 {¶ 14} Franklin County Forensic Pathologist Patrick Fardal testified that he performed an autopsy on Jerome Cunningham the same day he was killed. Fardal testified that Cunningham died as the result of a single .45 caliber gunshot wound to the left chest. The bullet lodged in Cunningham's back and was collected as evidence. The parties stipulated that the bullet was fired from the weapon taken from the roof of Cunningham's apartment and identified as State's Exhibit B-2a.
 {¶ 15} Appellant assigns three errors to the proceedings below, and states them as follows:
 ASSIGNMENT OF ERROR NUMBER ONE
RC § 2929.03(D)(3) is violative of the 14th Amendment to the Constitution of the United States because it irrationally distinguishes between individuals to whom a jury has recommended a sentenced [sic] of death and those to whom a jury has recommended a sentence of life imprisonment.
 ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in overruling appellant's motion for acquittal pursuant to OHIO CRIM.R. 29; appellant's convictions violate U.S. CONST. amend. VII and XIV and OHIO CONST. art. I, §§ 1, 2, 9, and 16 because the convictions are against the manifest weight of the evidence.
 ASSIGNMENT OF ERROR NUMBER THREE
The defendant was denied the effective assistance of counsel in violation of U.S. Const. Amend. 6.
 {¶ 16} In his first assignment of error, appellant challenges the constitutionality of the sentencing scheme found in R.C. 2929.03. That section sets forth the sentencing procedure to be followed when a defendant is convicted of aggravated murder. Subsection 2929.03(D)(2) of the Ohio Revised Code provides:
Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to one of the following:
(a) Except as provided in division (D)(2)(b) of this section, to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five [n2] full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment;
(b) If the offender also is convicted of or pleads guilty to a sexual motivation specification and a sexually violent predator specification that are included in the indictment, count in the indictment, or information that charged the aggravated murder, to life imprisonment without parole.
If the trial jury recommends that the offender be sentenced to life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five [n3] full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the sentence is a sentence of life imprisonment without parole imposed under division (D)(2)(b) of this section, the sentence shall be served pursuant to section 2971.03 of the Revised Code. If the trial jury recommends that the sentence of death be imposed upon the offender, the court shall proceed to impose sentence pursuant to division (D)(3) of this section.
 {¶ 17} Subsection 2929.03(D)(3) provides, in pertinent part:
Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section, if, after receiving pursuant to division (D)(2) of this section the trial jury's recommendation that the sentence of death be imposed, the court finds, by proof beyond a reasonable doubt, or if the panel of three judges unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, it shall impose sentence of death on the offender. Absent such a finding by the court or panel, the court or the panel shall impose one of the following sentences on the offender:
(a) Except as provided in division (D)(3)(b) of this section, one of the following:
(i) Life imprisonment without parole;
(ii) Life imprisonment with parole eligibility after serving twenty-five [n4] full years of imprisonment;
(iii) Life imprisonment with parole eligibility after serving thirty full years of imprisonment.
 {¶ 18} Appellant argues that Ohio's aggravated murder sentencing scheme impermissibly divides death penalty defendants into two classes who are treated differently at sentencing depending upon whether the jury recommends death or one of the life options. Appellant argues that R.C.2929.03(D)(3) denied him the equal protection of law because the trial judge was not vested with discretion to sentence appellant to a term of imprisonment less than that recommended by the jury, while defendants for whom juries have recommended a death sentence enjoy the benefit of the trial judge's "discretion" to impose one of the life sentences.
 {¶ 19} Appellant argues that the distinction between defendants for whom juries recommend death and those for whom juries recommend life, embodied within R.C. 2929.03(D)(3), is not rationally related to any legitimate state interest and thus is unconstitutional. He also argues that it is a violation of his right to equal protection of law that in cases such as his, where death penalty juries recommend a life option, trial judges possess no "traditional discretion" in sentencing.
 {¶ 20} Appellant argues that because he was sentenced pursuant to this statute, his case should be remanded to the trial court for resentencing, and that upon such re-sentencing, the trial judge should be vested with complete discretion to impose a life option other than that recommended by the jury.
 {¶ 21} In response, the state argues that appellant has not shown that Ohio's statutory aggravated murder sentencing classifications lack a rational basis. First, the state points out that, upon a recommendation of death by a jury, the trial judge does not exercise "traditional" discretion. Rather, he or she is required to independently perform the statutorily prescribed weighing of the aggravating circumstances and mitigating factors as did the jury. If, after engaging in this weighing process, the judge determines that the aggravating factors do not outweigh the mitigating factors beyond a reasonable doubt, then the judge must impose one of the life sentences. Thus, the judge's deviation from the jury's recommendation is based on a weighing process identical to, but separate from, that performed by the jury. The judge's function is to act as a trial-level review upon the jury's own weighing process.
 {¶ 22} The state argues that the General Assembly could rationally conclude that, because the death penalty is different enough from any sentence of confinement, a jury's death recommendation requires an immediate de novo review by the trial judge, while a jury's life imprisonment recommendation does not give rise to the need for this extra review.
 {¶ 23} The state points out that death penalty juries in Ohio are instructed in such a way that if, after engaging in the appropriate weighing of the statutory aggravating and mitigating factors, they conclude that death is not warranted, then this careful weighing process ends, and they employ no particular process or formula in choosing among the three life sentence options. Therefore, according to the state, the legislature could rationally conclude that a jury's verdict of life (with or without possibility of parole) need not be and cannot be "double-checked" by a judge in the manner provided for double-checking a jury's death recommendation.
 {¶ 24} Our analysis is guided by the principle that statutes enacted in Ohio are presumed to be constitutional. State v. Williams (2000), 88 Ohio St.3d 513. This presumption of constitutionality remains unless it is proven beyond a reasonable doubt that the legislation is clearly unconstitutional. See Roosevelt Properties Co. v. Kinney (1984),12 Ohio St.3d 7, 13. Therefore, we begin with the presumption that R.C.2929.03 is constitutional.
 {¶ 25} The Fourteenth Amendment to the United States Constitution provides that "no State shall * * * deny to any person within its jurisdiction the equal protection of the laws." The equal protection clause prevents states from treating people differently under its laws on an arbitrary basis. Harper v. Virginia State Bd. of Elections (1966),383 U.S. 663, 681, 86 S.Ct. 1079 (Harlan, J., dissenting). "Whether any such differing treatment is to be deemed arbitrary depends on whether or not it reflects an appropriate differentiating classification among those affected; the clause has never been thought to require equal treatment of all persons despite differing circumstances." Id.
 {¶ 26} The standard for determining if a statute violates equal protection is "essentially the same under state and federal law." Fabrey v. McDonald Village Police Dept. (1994), 70 Ohio St.3d 351, 353. "Under a traditional equal protection analysis, class distinctions in legislation are permissible if they bear some rational relationship to a legitimate governmental objective. Departures from traditional equal protection principles are permitted only when burdens upon suspect classifications or abridgments of fundamental rights are involved." State ex rel. Vana v. Maple Hts. City Council (1990), 54 Ohio St.3d 91, 92, citing Clements v. Fashing (1982), 457 U.S. 957, 963, 102 S.Ct. 2836.
 {¶ 27} Capital murder defendants for whom a jury recommends a life sentence are not members of a suspect class. "[A] suspect class is one `saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" Massachusetts Bd. of Retirement v. Murgia (1976),427 U.S. 307, 313, 96 S.Ct. 2562, quoting San Antonio Indep. School Dist. v. Rodriguez (1973), 411 U.S. 1, 28, 93 S.Ct. 1278.
 {¶ 28} Nor does R.C. 2929.03 implicate a fundamental constitutional right. Some rights which have been recognized as fundamental include the right to vote, the right of interstate travel, rights guaranteed by the First Amendment to the United States Constitution and the right to procreate. Murgia, at 312, fn. 3. See, also, Albright v. Oliver (1994), 510 U.S. 266, 272, 114 S.Ct. 807. Thus, appellant's equal protection challenge to R.C. 2929.03 is properly analyzed under the rational basis standard.
 {¶ 29} Appellant's argument presents the question whether the procedures governing sentencing set forth in R.C. 2929.03
unconstitutionally distinguish between convicted aggravated murder defendants for whom the jury has recommended death, and those for whom the jury has recommended one of the life options. We believe that well-established death penalty jurisprudence requires that we answer this question in the negative.
 {¶ 30} Under the rational basis standard, courts are to grant substantial deference to the predictive judgment of the General Assembly. See Turner Broadcasting Sys. v. Fed. Communications Comm. (1997), 520 U.S. 180, 195, 117 S.Ct. 1174. Under rational basis scrutiny, legislative distinctions are invalid only if they bear no relation to the state's goals and no ground can be conceived to justify them. Fabrey v. McDonald Village Police Dept. (1994), 70 Ohio St.3d 351,353. The state does not bear the burden of proving that some rational basis justifies the challenged legislation; rather, the challenger must negate every conceivable basis before an equal protection challenge will be upheld. See, Heller v. Doe (1993), 509 U.S. 312, 320, 113 S.Ct. 2637.
 {¶ 31} The United States Supreme Court has repeatedly emphasized the qualitative difference between death and all other penalties. See Eddings v. Oklahoma (1982), 455 U.S. 104, 102 S.Ct. 869; Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954; Woodson v. North Carolina (1976),428 U.S. 280, 96 S.Ct. 2978; Rummel v. Estelle (1980), 445 U.S. 263,100 S.Ct. 1133; and California v. Ramos (1983), 463 U.S. 992,103 S.Ct. 3446.
 {¶ 32} "Among the most important and consistent themes in [the United States Supreme] Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction." Thompson v. Oklahoma (1988),487 U.S. 815, 856, 108 S.Ct. 2687 (O'Connor, J., concurring).
 {¶ 33} Mindful that the death penalty befittingly occupies a unique place in American criminal jurisprudence, we hold that Ohio's aggravated murder sentencing scheme, found at R.C. 2909.03, bears a rational relationship to the legitimate governmental interest in meting out punishment by death only in the gravest of cases, and only after the most careful, thorough and fair consideration of the nature and circumstances of each case and the history, character and background of each offender.
 {¶ 34} In Ohio, if at least one of the statutory death specifications is charged in an indictment, the defendant is afforded a bifurcated trial wherein the question of guilt is determined by the trier of fact, independent of any punishment considerations. Only if the defendant is found guilty beyond a reasonable doubt of at least one capital offense is this first phase followed by a separate evidentiary proceeding to determine the appropriate punishment.
 {¶ 35} During the penalty phase, the jury and the judge are required to separately and independently decide whether, based upon proof beyond a reasonable doubt, the aggravating circumstances the defendant was found guilty of committing outweigh the mitigating factors present in the case. R.C. 2909.03(D)(2).
Only where it is determined, beyond a reasonable doubt, that the aggravating factors outweigh the mitigating factors may a defendant be sentenced to death. In a case tried before a jury, R.C. 2929.03 assigns this weighing task to both the judge and the jury. Following independent deliberations, the jury and judge are required to come to separate conclusions regarding whether life imprisonment or death is the appropriate sentence in the case.
(Emphasis sic.) State v. Buell (1986), 22 Ohio St.3d 124, 136.
 {¶ 36} In order to safeguard against arbitrary and capricious levying of the death penalty in Ohio, the General Assembly chose to require that both a judge and a jury of twelve independently examine the circumstances of each individual homicide and each individual defendant in deciding whether the death penalty will be imposed in any given case. Ohio's aggravated murder sentencing scheme gives defendants convicted of a capital offense one additional individualized examination of the relevant facts and circumstances involved in their crime before death can be imposed. This is rationally related to the legitimate state purpose of ensuring that the ultimate punishment is assigned only to the worst offenses and offenders. Because death is so unlike any of the life options (even life without possibility of parole), the jury's decision to impose death is a "recommendation" while its decision to impose a life sentence is essentially in the nature of a verdict. The General Assembly could rationally conclude that although aggravated murder defendants faced with death need a second decision-maker to scrutinize the appropriateness of their punishment, those faced only with life imprisonment need no such added scrutiny because they do not face the ultimate penalty.
 {¶ 37} R.C. 2929.03(D)(3) rationally requires that, owing to its unique qualities, a death sentence may only be imposed as punishment after the aggravating circumstances and mitigating factors are weighed in two identical yet separate processes. That is, the judge's discernment process exists alongside and as a complement to that of the jury. Appellant suggests that for those such as him, upon whom the jury imposes a life sentence, the judge should have absolute authority to simply "overrule" the jury, regardless whether the two triers of fact utilize the same or even similar processes to reach their respective conclusions.
 {¶ 38} We do not believe that the legislature's decision to decline to afford such special treatment to those aggravated murder defendants not facing death is irrational or unconstitutional on equal protection grounds. Appellant fails in his attempt to cast himself as a victim of Ohio's aggravated murder sentencing scheme, as opposed to a beneficiary of its protective features. Accordingly, we overrule appellant's first assignment of error.
 {¶ 39} In his second assignment of error, appellant argues that the trial court erred in overruling his motion for acquittal pursuant to Crim.R. 29, because the evidence was legally insufficient to sustain his convictions, and that his convictions are unconstitutional because they are against the manifest weight of the evidence.
 {¶ 40} The Supreme Court of Ohio outlined the role of an appellate court presented with a sufficiency of evidence argument in State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime proven beyond a reasonable doubt. * * *
See, also, Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781.
 {¶ 41} This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172,175. Rather, the sufficiency of evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, at 319. Accordingly, the weight given to the evidence and the credibility of witnesses are issues primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79,80.
 {¶ 42} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a "thirteenth juror." Under this standard of review, the appellate court weighs the evidence in order to determine whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387. The appellate court, however, must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The power to reverse on manifest weight" grounds should only be used in exceptional circumstances, when "the evidence weighs heavily against the conviction." Thompkins, at 387.
 {¶ 43} First, appellant argues that certain aspects of the testimony of witnesses Wendall and Roderick Brown, Faith Brown and Detective Warnick contain inconsistencies; that, the Brown brothers' drinking and Faith Brown's emotional state at the time she was initially questioned render the evidence insufficient to sustain his convictions. We disagree.
 {¶ 44} Two eyewitnesses saw appellant ask the victim for money and immediately thereafter saw the victim fall from a single gunshot wound. Though neither witness actually saw the gun when the shot was fired, both testified that they were certain that appellant was the shooter. The clothing worn by appellant on the night of the murder matched the description of the shooter's clothing given by all three eyewitnesses. Immediately after the victim was shot, Faith Brown saw appellant holding a gun, leaning over the victim and putting his hand in the victim's pocket. Faith Brown identified the gun recovered by police as the same gun she saw in appellant's hand as he leaned over the victim and shouted at her to get back. A wallet containing the victim's identification and loose cash was found on appellant's person when he was arrested by police. Appellant fled when the police attempted to gain his attention during their initial response to the scene. Appellant was wearing only one shoe when he was apprehended; the police found a single shoe at the bottom of the stairs leading up to the victim's apartment. We conclude that evidence was not lacking on any essential element of the crimes of aggravated murder and aggravated robbery. The jury did not lose its way in finding that the weight of the evidence supported appellant's convictions. Appellant's second assignment of error is overruled.
 {¶ 45} In his third assignment of error, appellant argues that he was denied the effective assistance of counsel because: (1) counsel failed to "exploit the defense of intoxication to negate the mens rea element of the crimes charged"; (2) counsel failed to interview other persons who were present at the scene of the shooting but who were not called as witnesses for the state; (3) counsel failed to request a missing witness charge; (4) counsel rebuffed appellant's requests to waive his right to a trial by jury, and to testify in his own behalf; and (5) counsel failed to properly cross-examine the medical examiner and the Crime Scene Search Unit detective regarding wound and blood evidence and a negative residue test supposedly performed on appellant shortly after he was taken into custody.
 {¶ 46} In order to demonstrate that his counsel's representation was ineffective, appellant must demonstrate that: (1) counsel's performance was deficient; and (2) this deficient performance prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.
 {¶ 47} "A defendant does not state a claim for ineffective assistance of counsel unless his attorney acted unreasonably given the facts of the case, and the unreasonable conduct was prejudicial to the defense." State v. Mills (1992), 62 Ohio St.3d 357, 370, certiorari denied, Mills v. Ohio (1992), 505 U.S. 1227, 112 S.Ct. 3048. Counsel need not raise meritless issues. State v. Hill (1996), 75 Ohio St.3d 195. A defendant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other. Strickland, at 697.
 {¶ 48} Appellant claims his counsel should have explored the use of voluntary intoxication as a means to negate the mental state required for the crimes with which he was charged. However, voluntary intoxication may no longer be taken into account in determining the existence of a mental state that is an element of a criminal offense. In the year 2000, the General Assembly amended R.C. 2901.21. That statute now provides that voluntary intoxication may only be taken into consideration with respect to whether the person charged was physically capable of performing the act with which he is charged. R.C. 2901.21(C). In this case, the record does not support the conclusion that appellant's voluntary intoxication was relevant to the issue of his physical capability to shoot Cunningham. Accordingly, appellant's counsel was not ineffective for failing to pursue this avenue of defense.
 {¶ 49} With respect to appellant's claim that his trial counsel should have interviewed potential witnesses who were not called as witnesses by the state, appellant argues that "there is no indication that counsel sought to interview these witnesses, nor was investigation done to determine whether their testimony might have been cumulative or shed additional light upon the circumstances surrounding the shooting." (Appellant's brief, at 28.) However, the record is insufficient to negate the presumption that counsel acted competently.
 {¶ 50} Furthermore, counsel's billing records reflect that counsel engaged the services of an investigator who billed counsel for efforts to locate and interview several witnesses not called by the state. There exist numerous possible strategic reasons for counsel's decision not to subpoena these individuals for trial, and counsel could have been acting in appellant's best interest in choosing to proceed in this manner. Appellant has failed to demonstrate, and the record fails to support, the conclusion that appellant suffered actual prejudice as a result of counsel's failure to present the testimony of certain, unidentified witnesses. Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998), 81 Ohio St.3d 673, 675. Tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995),72 Ohio St.3d 545, 558 ("Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel").
 {¶ 51} With respect to appellant's contention that counsel should have requested a missing witness instruction to the jury, the two requirements which must be met for a missing witness instruction are as follows: the witness in question must be within the particular power of a party to produce and the testimony of that witness would elucidate the transaction. State v. Long (Sept. 27, 1984), Franklin App. No. 83AP-444. If the testimony of the missing witnesses would have been merely cumulative to the officers on the scene, then it would not naturally be produced by the state, and the requested instruction would not be appropriate. Silveous v. Rensch (1969), 20 Ohio St.2d 82. There is no evidence in the record that the witnesses appellant claims were "missing" were within the particular power of the state to produce, that their testimony would elucidate the transaction or that their testimony would not be merely cumulative to testimony of the officers and other witnesses. Accordingly, counsel was not ineffective in failing to request a missing witness instruction.
 {¶ 52} Appellant next argues that his counsel was ineffective because they did not afford appellant a meaningful opportunity to participate in his own defense. Specifically, appellant argues that he expressed his desire to waive his right to a trial by jury, and to testify in his own behalf, but that counsel refused to allow him to take either action. The record reflects that the first time appellant raised these issues was during his unsworn statement to the trial judge at sentencing, when he stated he had been "willing" to testify but his counsel "didn't let [him] take the stand." He further stated during his allocution that his counsel, "waived [his] rights" to a three-judge panel.
 {¶ 53} We note initially that appellant brought these matters to the attention of the trial court far too late in the process for the court to be able to assist him in resolving these alleged strategic disagreements with trial counsel. The fact that appellant unduly delayed raising these concerns imbues them with a sense of self-serving artifice. Moreover, the record is insufficient to demonstrate that counsel acted incompetently in trying this case to a jury or in failing to call appellant to the witness stand. The record also fails to reveal that actual prejudice resulted from these decisions. Accordingly, we find no ineffective assistance with respect to them.
 {¶ 54} Appellant also claims his counsel was ineffective in the cross-examinations of the medical examiner and the crime scene detective. Appellant argues that his trial counsel should have questioned the medical examiner, Dr. Fardal, about the distance between the muzzle of the murder weapon and the victim, in order to "contradict the testimony of the eye witnesses as to the relative positions of the shooter and victim." (Appellant's brief, at 30.) However, the record reveals that appellant's counsel did cross-examine Dr. Fardal about the absence of soot and stippling on the victim. Dr. Fardal testified on cross-examination that the absence of soot indicates the weapon was greater than six inches from the victim when it was fired; he testified that the absence of stippling indicates the weapon was greater than three feet from the victim when it was fired. In any case, there is no indication in the record that the "relative positions of the shooter and victim" was a fact at issue or was pivotal to the outcome of appellant's trial. We therefore find no ineffectiveness in counsel's cross-examination of Dr. Fardal with respect to gun-to-victim distance.
 {¶ 55} Appellant also attempts to impugn trial counsel's cross-examination of Dr. Fardal because counsel failed to explore the presence or absence of bloodstains or spatters on appellant's or the victim's clothing, and the absence of an exit wound. Trial counsel's failure to explore the presence or absence of bloodstains and the absence of an exit wound can be attributed to counsel's theory of the case and tactical decision-making (which, though professionally reasonable, might be different from a theory that other defense attorneys might have developed, or decisions other counsel might have made). We will not second-guess trial strategy, especially when the record provides no basis for us to conclude that further cross-examination of Dr. Fardal would have revealed any facts which would have changed the outcome of the trial, or would even have been favorable to appellant. See State v. Brown (1988), 38 Ohio St.3d 305 and State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037. Appellant fails to persuade us that, based upon the record, the failure to explore these questions on cross-examination constitutes incompetence on the part of his trial counsel.
 {¶ 56} Appellant also claims ineffective assistance in the cross-examination of Detective Jackson, of the Columbus Police Crime Scene Search Unit. Appellant contends his trial counsel should have questioned Detective Jackson regarding a negative gunpowder residue test appellant says was performed on him shortly after he was taken into custody. This contention is at odds with appellant's statement during his allocution, in which he stated that he was not sure of the results of the test. It is also inconsistent with the filing of a motion to suppress these test results filed December 11, 2001, on behalf of appellant. Without evidence in the record to support such a conclusion, we cannot say that the failure to cross-examine Detective Jackson about the results of gunpowder residue testing fell to the level of ineffective assistance; in fact, it is just as likely that this failure was an astutely calculated decision on the part of trial counsel. An appellate court reviewing an ineffective assistance of counsel claim usually will not second-guess counsel's strategy in direct and cross-examination of witnesses (State v. Thacker, Franklin App. No. 02AP-113, 2002-Ohio-5571; State v. Poole, Cuyahoga App. No. 80150, 2002-Ohio-5065) and we decline to do so here. For all of the foregoing reasons, we conclude that appellant's trial counsel was not ineffective and thus, appellant's third assignment of error is overruled.
 {¶ 57} Having overruled all of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
LAZARUS and WATSON, JJ., concur.